## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| STEPHEN "COBEY" MONDEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No.: |
| | § | |
| CONSOLIDATED NUCLEAR | § | |
| SECURITY, LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## COMPLAINT

Plaintiff Stephen "Cobey" Monden ("Monden" or "Plaintiff") files this Complaint against Defendant Consolidated Nuclear Security, LLC ("CNS" or "Defendant").  Plaintiff asserts causes of action against Defendant under the National Defense Authorization Act of 2013, 41 U.S.C. § 4712, and under Texas common law negligent misrepresentation and fraud.

### THE PARTIES

1.      Plaintiff Stephen Monden is an individual residing in Amarillo, Texas.  He may be contacted through his attorney of record, Eric J. Cassidy.

2.      Defendant Consolidated Nuclear Security, LLC is a Delaware limited liability corporation doing business in Tennessee.  It can be served with process through its registered agent, United Agent Group, Inc., 205 Powell Pl., Brentwood, Tennessee 37027-7522.

### JURISDICTION & VENUE

3.      The Court has jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000.00.

4.      The Court also has jurisdiction over the lawsuit because the suit arises under 41 U.S.C. § 4712.

## FACTUAL BACKGROUND

### A.      The Pantex Plant

5.      In 2010, Plaintiff Cobey Monden started work at the Pantex Plant ("Pantex") in Amarillo, Texas.   Since 1975, Pantex has been the nation's primary assembly, disassembly, retrofit, and life-extension center for nuclear weapons.   The Pantex Plant is located on an 18,000-acre site, which has approximately 650 buildings.   There are approximately 3,300 full-time personnel working at Pantex.

6.      Pantex has several national security missions.   Pantex is the nation's primary site for assembly and disassembly of nuclear weapons.   Pantex builds and delivers nuclear weapons, replacing parts and components to extend the lives of the weapons.   The U.S. no longer tests nuclear weapons; thus, Pantex plays a role in confirming the effectiveness of the weapons.   Pantex also completely dismantles retired weapons.   Pantex's work reduces the number of nuclear weapons in the world and is designed to ensure that nuclear material is in safe and secure storage. Pantex also develops, tests, and fabricates explosives components.

### B.      CNS's Retaliation

7.      Since 2015, the Pantex Plant has been managed by Defendant CNS.   According to CNS, at the end of 2018, it learned of "overtime anomalies" related to employee timekeeping at the Pantex Plant.   In January 2019, it began to compare employee time records entered into a software program called OneTime with Argus badge reader records, which show the date and time when a Pantex employee entered and exited secured areas in the Plant.   Because Pantex is, on information and belief, under the jurisdiction of the Department of Energy, the Inspector General ("IG") decided to interview CNS employees about potential timekeeper fraud at CNS.

8.      Monden and more than 50 other people who worked at Pantex were interviewed by the IG.  Monden interviewed with IG agents in July 2019 and provided information and evidence to the agents.  He disclosed facts to the IG that were specific to the IG's investigation into fraudulent timekeeping practices under the federal contract managed by CNS.

9.      After Monden interviewed with IG agents, CNS fired him for alleged "fraudulent timekeeping practices."

C.      **Monden's Background**

10.     After graduating from high school, Cobey Monden served in the United States Army.  He was honorably discharged due to a medical condition (keratoconus) in both of his eyes.  Despite this serious health issue, Monden graduated from Wayland Baptist University with a 3.6 GPA.  He made the Dean's List twice and President's List (4.0 in a semester with at least 12 credit hours), earning 56 credits from the fall of 2011 to the spring of 2013 while working full-time at Pantex, raising three children, and actively participating in his church.

11.     Monden started at Pantex as a janitor in 2010 while attending school.  Over time, he was promoted to Production Technician (PT) and later to the position of Production Section Manager (PSM).  As one of many PSMs, Monden was responsible for supervising PTs or the employees who had "feet on the ground" in the Plant.  PTs are trained to support federal requirements to inspect, retrofit or disassemble nuclear weapons.

12.     During his career at Pantex and working for CNS, Monden was never "written up" or subjected to disciplinary action.  He has never been fired by any other employer.  Monden has worked, schooled, and raised three children during his many eye surgeries, including corneal transplants on both of his eyes.  He has fought infection and transplant rejection on both eyes, had cataracts in both eyes, and required cataract surgery.  Despite these health issues, Monden received a critical retention bonus every year that he was a PSM.  Senior management was discussing with

Monden a promotion to Production Manager in 2019 when he was wrongfully terminated after interviewing with the IG.

13.    After being fired by CNS, Monden worked at Eaton for five months and then was laid off due to the downturn in the economy related to the pandemic.  Eaton initially decided to hire Monden back but told him that, because of his termination at Pantex and pending government actions, he was ineligible to be rehired.  Monden could not find work (possibly because of Pantex's defamation) and he received unemployment.  He eventually accepted a job as a full-time substitute teacher (non-certified) making less than what he received for unemployment.  Monden believes in working and wanted the opportunity to teach young people.

### D.    The Facts and Law Related to 41 U.S.C. § 4712

14.    CNS's wrongful termination of Monden for providing testimony and facts to the IG about fraudulent timekeeping practices at CNS is a violation of 41 U.S.C. § 4712.  The law is plain that information disclosed by a person in response to questions in an IG investigation cannot be a basis for terminating or changing an employee's employment status.  The statute reads in relevant part:

> **(a)    Prohibition on Reprisals –**
>
> (1)    In General.—**An employee of a contractor, subcontractor, or grantee may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing** to a person or body described in paragraph (2) **Information that** the employee reasonably believes **is evidence of gross mismanagement** of a Federal contract or grant, **a gross waste** of Federal Funds, **an abuse of authority** related to a Federal contract or grant, a substantial and specific danger to public health or safety, **or a violation of law, rule, or regulation related to a Federal contract** …. [§ 4712(a)(1) (emphasis added)]

The Code's Rules of Construction state that, "**an employee who initiates or provides evidence of contractor**, subcontractor, or grantee **misconduct** in any judicial or administrative proceeding

**relating to waste, fraud, or abuse on a Federal contract or grant shall be deemed to have made a disclosure** covered by such paragraph[.]" [§ 4712(a)(3)(A)].

15.     Monden, and more broadly more than 50 other CNS employees, provided specific evidence of fraud by CNS management and CNS's abuse of its federal contract to investigators from the IG.  Monden's disclosure of information to the IG specific to the IG's civil and criminal investigations into CNS's billing practices under a federal contract establishes a *prima facie* case for whistleblower protection under 41 U.S.C. § 4712.  The elements for whistleblower protection are:

> **Element (1):**
>
> **(1)     An employee may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing evidence to the Inspector General.**

16.     Monden and other CNS employees provided evidence to Special Agents with the IG in interviews that occurred during the fall of 2019 and spring of 2020.  CNS employees were told by Special Agents that they were being interviewed as part of an investigation into alleged fraudulent billing practices by CNS.  At least one CNS employee was specifically told "that everything I said to them [the IG agents] was protected under the Whistleblower Act."

17.     The first group of employees who were retaliated against—approximately 14 individuals—were at work on the morning of August 14, 2019, when they were summoned without notice by CNS to interviews with IG Special Agents, including Agents Louis Gomez, Joseph Davila and Christina McCurdell.

18.     These employees provided evidence in the form of testimony about facts specific to alleged fraudulent billing practices instituted by CNS management.  The employees were told by the IG agents that they could not be fired by Pantex or CNS for talking to the IG and that nothing they told the IG would be shared with CNS.

19.     Immediately after their interviews, the employees were subjected to reprisal by CNS.  An employee was told by CNS that he was being placed on paid leave immediately following his interview on August 14, 2019.  Indeed, at least six employees were taken into a room where they were informed that they were being placed on administrative leave for 30 days pending the ongoing IG investigation.

20.     At least fifteen employees were fired by CNS after they interviewed with the IG, including Monden.  Another 20 were placed on administrative leave without pay by CNS, and still others were placed on paid administrative leave.  CNS told these employees that they were required to disclose everything that they had told the IG.  One of the employees was fired in October 2019, after 37 years of employment.  Another employee was forced to retire after he told CNS what he disclosed to IG agents.  The IG told one employee during his interview that he was "cleared," and the IG called CNS's Human Resources Department to inform them that day that no action would be taken against that individual.  But, despite the fact that CNS was told the individual was "cleared," CNS's Human Resources Department told the employee that CNS would conduct its own investigation and suspended him with pay immediately and, later, without pay starting on November 1, 2019.

21.     Monden and other employees were retaliated against by CNS for providing information to the IG as part of an IG investigation.  CNS told employees that they were being placed on unpaid leave "because [they] interviewed as part of the IG investigation and it was company policy to place people involved in the investigation on unpaid leave."  The employees were told they were being placed on leave or fired because they talked to the IG about allegations of fraud at CNS:

> ▪ "I was informed [by CNS] that anyone interviewed by the IG would be placed on 30 days administrative leave."

- 6 -

- ▪ "[CNS personal] walked me down the hall and took my badges and told me I was on admin leave pending investigation by the IG and that since I had talked to the IG I was on an automatic 30 days with paid admin leave …. During my [CNS] interview, [CNS] insinuated that my job was at risk because the IG wanted to talk with me and I was being investigated."

- ▪ "CNS personnel told me it was their practice to put me on leave since the IG investigated me."

- ▪ "CNS placed me on leave the same day I was interviewed by the IG … CNS said it was part of their investigation [to place me on leave]."

- ▪ "I was walked out because I spoke with the IG. [CNS] said it was standard procedure …. But in my interview [with CNS], we never discussed anything about my time!"

22.     CNS's reprisals against employees who talked to the IG also took the form of publicly humiliating the employees who interviewed with the IG on August 14, 2019:

- ▪ "Immediately after my interview with the IG [on August 14, 2019], I was taken by van with security guards to a small room & placed on admin leave with no explanation. I felt like a criminal. They paraded us in front of our peers with armed security guards. It was humiliating. Then they escorted us to our cars to leave the plant."

- ▪ "After I was interviewed by the OIG, I was interviewed by CNS about my interview with [IG]. The minute my interview with CNS ended, armed guards took my security badge and escorted me to a waiting van, where I was made to stay for 2.5 hours. Eventually I and five others were taken into a room where we were informed that we were being placed on administrative leave for 30 days."

- ▪ "Guards then took us to change into our street clothes, and then we were each escorted to our vehicles to leave. Word about all this got around town, and everyone is talking about us like we are criminals."

- ▪ "After interviewing with the IG, CNS had the security force take my badge and the guards put me in a bus and took me to talk to HR, then HR put me on paid admin leave. The guards took me into the plant to change like I was a criminal, then they escorted me off the site. This happened around quitting time so other workers got to see me being escorted around. I was fired on October 18, 2019[.]"

23.     In addition, certain employees who were interviewed after August 14, 2019 were subjected to public humiliation immediately before they were interviewed by agents for the IG:

▪ "Before my interview with the IG, we were told to wait in a room together in one of the cafeterias for someone to come and get us.  We were then loaded into vans and taken under armed guard to our administrative building, where we were marched in front of large windows along the side of the building, like were being put on display for others to see.  We were then held in a room awaiting our interview with the IG for hours.  After the interview, we were taken to meet with Heather Freeman (also under armed guard) and were immediately placed on administrative leave with pay [changed to unpaid leave on Nov. 1, 2019] …. [we] were paraded through the plant in a single file convoy by armed guards …."

CNS discharged, demoted, or otherwise humiliated and discriminated against employees who talked to the IG as part of the IG's investigation.

**Element (2):**

(2) **Information that the employee reasonably believes is evidence of gross mismanagement, gross waste of Federal Funds, an abuse of authority, or violation of law, rule, or regulation related to a Federal contract.**

24.    Monden and other employees provided to IG Special Agents evidence of gross mismanagement, abuse of authority, and violations of law related to CNS's federal contract.  This evidence included testimony relating to CNS's fraudulent timekeeping practices, which occurred under CNS's federal contract to manage and operate the Pantex Plant.  The testimony collected by the IG in its interviews with Monden and CNS employees has been used by the Department of Justice to pursue civil and criminal claims against CNS employees.  Monden and CNS employees provided testimony detailing CNS management's practices that created the "culture" in question. Monden and others truthfully answered numerous questions about management's billing practices, and their own timekeeping, and other employees' timekeeping practices.  Monden and other employees identified to the IG members of CNS's management who created the culture and instructed employees to enter time in a manner contrary to government requirements.

25.    Later, CNS learned the questions that those employees were asked by the IG by threatening the employees with termination if they did not disclose what they told the IG.  These

threats by CNS occurred in interviews that CNS conducted with employees after the employees were interviewed by the IG.  CNS interviewers told one employee to tell them "everything I had told Mr. Gomez (an IG agent) during my interview with him."  This employee was told that he would be fired unless he told CNS what he said to the IG.  CNS's threats of retaliation were common:

- ▪ "CNS interviewed me a week after the IG interview.  They said I had to tell them what I discussed with the IG."

- ▪ "It was a condition of employment to answer [CNS's] questions" about what employees disclosed to the IG.

- ▪ "[CNS] wanted to know exactly what I told the IG."

- ▪ "CNS told me I had to tell them what I discussed with the IG, that I would be fired unless I told them[.]"

- ▪ "[CNS] asked about the topics the IG had asked about."

- ▪ "CNS told me I was put on paid leave because of the IG investigation [changed to unpaid leave on Nov. 1, 2019]."

- ▪ "[CNS] asked me about the same topics the IG asked me about.  I was treated like a criminal and a liar, and was then fired."

- ▪ "[CNS] wanted to know everything I told the OIG.  I received a letter [approximately a month later] telling me that I had been terminated."

- ▪ "I told [CNS] that I was not permitted to discuss the particulars of my IG interview.  They told me that under the terms of my CNS contract, I was required to cooperate with them, or I could be terminated."

Because the employees were threatened and told that they would be fired if they did not divulge what they told the IG, at least one employee told CNS "everything I said and the questions that I was asked."  CNS then used this information, and in particular the list of questions asked by the IG, to interrogate more than 70 additional CNS employees.  Indeed, employees have reported that CNS asked them "the same questions" that they were asked by agents in the IG interviews.

### E.   CNS's Likely Defenses Do Not Address Plaintiff's Statutory Claim and Lack Factual Merit

#### 1.   CNS has left unanswered the fundamental questions about its mismanagement of the Pantex Plant.

26.     Before CNS is allowed to scapegoat employees and deflect responsibility for known problems in its management and operation of the Pantex Plant, it should be required to answer fundamental questions:

- Why was there so much confusion surrounding timekeeping at Pantex? Why was the issue not addressed by CNS in the fall of 2018 when CNS alleges that it discovered timekeeping "anomalies"?

- Why didn't CNS incorporate time clocks or provide PSMs access to Argus records to verify time for their employees when it learned of time "anomalies" in the fall of 2018?

- How could CNS expect PSMs to verify time on a Monday morning for employees who worked over the weekend when the weekend supervisor was off at that time?

- Why did CNS fail to take action when provided notice of timekeeping issues?

- Since there are so many questions and concerns, why didn't CNS revise, clarify or update its training to better assist PSMs and PTs in meeting timekeeping requirements?

#### 2.   The methodology of comparing Argus to OneTime is flawed and proves nothing.

27.     CNS is likely to contend that Monden was fired because of alleged "anomalies" in his timekeeping records.  But such arguments are irrelevant to its liability under 41 U.S.C. § 4712. Under the statute, an employee cannot be discriminated or reprised against for providing evidence of gross mismanagement or violation of the law or rules related to a federal contract.  Monden is a whistleblower under the statute.  He is therefore protected from reprisal because he provided evidence to assist the government's investigation into CNS.

28.    Even if that were not the case, CNS's claims relating to Monden and other employees lack merit.  CNS has alleged in other venues that other employees have allegedly committed timekeeping fraud.  According to CNS, records from the Plant's Argus system, which identifies the time an employee works in a secured area, often has not matched the entries made by employees into CNS's OneTime timekeeping system.  The OneTime system records the amount of time an employee worked at the Plant as a whole on a particular day, and not just the time that he or she spent in an Argus secured area.  The comparison of Argus records to OneTime timekeeping entries proves nothing.  Argus is intended to track the time an employee is working in a secured area inside the Plant in the event of a security breach.  OneTime is an "honor system" timekeeping software that employees use to enter their daily time at the Plant – which includes time worked outside of the secured area and therefore is time that is <u>not</u> accounted for by Argus.  There is no direct correlation between the two systems.

29.    The noncongruence between Argus and OneTime was known by CNS.  The Argus security system and the OneTime timekeeping system are not the same.  Employees commonly worked outside the secured areas while working at Pantex.  Indeed, there are approximately 650 buildings on the 18,000-acre site, many of which are not secured or monitored by Argus.  An employee's time entry for work performed outside the secured area was reviewed and approved not just by Monden or other PSMs, but also by CNS management, accounting and its payroll department.

### 3.    CNS cannot rule out alternative explanations for discrepancies between timekeeping records and Argus records.

30.    Monden routinely worked outside of the secured area in the Plant, including time at the Guard Station, the cafeteria, in training areas, the administration building, monitoring employees in the parking lot, conferring with employees and professionals in medical and fire

prevention, and conferring with janitorial services.  He was a supervisor and therefore was responsible for covering a large range of areas in the Plant that were outside Argus secured areas. Given the complexity of Monden's job as a PSM or supervisor, it is highly likely that he would actually work outside the secured areas and Argus security system.

31.     On information and belief, CNS is concealing facts that show CNS management knew about flaws in the OneTime system and did nothing.  On May 5, 2020, the previous Senior Director of Nuclear Weapons Operations, David Cole, wrote to Todd Ailes, Vice President and Pantex Site Manager, and Morgan Smith, CNS President and CEO.  Cole wrote in part that the timekeeping system was flawed because there were no time clocks, not enough supervisors to accurately approve employee time, and the union contract diminished a PSM or supervisor's ability to discipline employees committing time fraud.  Cole stated that CNS had a lack of accountability and implied a lack of institutional control.  He outlined known deficiencies in the organization's timekeeping design and reporting structures.  But, despite Cole's notice of these timekeeping defects, CNS took no action.

32.     Indeed, CNS failed to provide Monden and other PSMs with any means to actually verify time (no time clocks installed and no access to Argus records).  PSMs placed CNS's management on notice about timekeeping issues for years.  Monden and other PSMs asked CNS to install a time verification system (TimeClock) to verify time entries.  CNS denied these requests.

33.     CNS also failed to update policies, procedures, forms, systems and controls to create consistency and accountability in the timekeeping system.  This was a failure by CNS, which knew of these issues but refused to install time verification systems.  On information and belief, a Kronos Time and Attendance system is now being installed by CNS at multiple areas around the Plant—years after CNS was put on notice of time "anomalies."

34.     Finally, CNS management is responsible for implementing the system or course of business dealing that Defendant has attempted to scapegoat plaintiff for—namely, CNS management attempting to incentivize PTs and employees to meet production goals by allowing them to leave work early on days when a goal was met but be paid for a full day.  CNS management directly instructed Monden to follow this course of business on at least two occasions.   On information and belief, CNS has taken no action against its management for directing Monden and other PSMs to comply with this course of dealing.

## CAUSES OF ACTION

### COUNT ONE:

### Violation of the National Defense Authorization Act of 2013, 41 U.S.C. § 4712

35.     Paragraphs 1 through 34 are incorporated by reference.

36.     Monden was wrongfully fired by CNS as a reprisal for disclosing to the IG information that he reasonably believed was evidence of gross mismanagement by CNS of its federal contract related to Pantex.  Monden further provided information to the IG about CNS's abuse of authority related to its federal contract, and violations of law, rules and regulations related to CNS's federal contract.  § 4712(a)(1).

### COUNT TWO:

### Implicit Fraud Under Texas Common Law

37.     Paragraphs 1 through 36 are incorporated by reference.

38.     CNS committed implicit fraud.  CNS concealed the fact that CNS management instituted a course of dealing with Monden and other Plant employees in which employees were given production goals and allowed to bill for a full day's work on the day those production goals were met.  CNS omitted this fact from government officials and scapegoated Monden in an effort to procure and renew its government contract to operate Pantex.  CNS further committed implicit

fraud by concealing the material facts related to the underlying reasons for timekeeping anomalies at the Plant.  As a direct and proximate result of CNS's fraud and deceit, Monden has been damaged in an amount to be proved at trial.

**COUNT THREE:**

**Negligent Misrepresentation**

39.     Paragraphs 1 through 38 are incorporated by reference.

40.     Defendant made representations to Plaintiff in the course of CNS's business, specifically that he was required to approve a full day's work for PTs or employees when a production goal was met even if they left early that day.  CNS did not use reasonable care in obtaining or communicating the timekeeping information.  Plaintiff justifiably relied upon CNS's representations.  CNS's negligent misrepresentations proximately caused injury to Monden.

**JURY DEMAND**

41.     Plaintiff demands that this Court empanel a lawful jury to hear this case and decide this matter on the merits at trial.

**PRAYER**

42.     Plaintiff Stephen "Cobey" Monden prays that Consolidated Nuclear Security, LLC be cited to appear and answer, and that upon final hearing Plaintiff have and recover from CNS as follows:

a.     Actual damages within the jurisdictional limits of the Court;

b.     Back pay and front pay within the jurisdictional limits of the Court;

c.     Compensation for loss of employee benefits, including but not limited to medical, dental, life, 401(k), pension and retirement benefits;

d.     Reinstatement of his employment and position at Pantex;

e.     Compensatory damages for past and future pecuniary losses, emotional pain, suffering and inconvenience;

f.      Exemplary or punitive damages;

g.      Pre- and post-judgment interest at the highest rates allowed by law;

h.      All reasonable and necessary attorney fees under statutory and common law;

i.      All costs of court; and

j.      Such other and further relief, at law or in equity, to which Plaintiff is justly entitled.

January 11, 2022.

> Respectfully submitted,
>
> CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
>
> /s/ *Eric J. Cassidy*
> Eric J. Cassidy
> Texas Bar No. 24031807
> S.D. Tex. No. 30001
> 2 Houston Center
> 909 Fannin Street, Suite 3800
> Houston, Texas  77010
> (713) 331-2456 (Direct)
> (832) 331-6778 (Mobile)
> (832) 390-2655 (Fax)
>
> **ATTORNEYS FOR PLAINTIFF STEPHEN MONDEN**